# Independent Investigation of the Death of Michael Barton:

# Mental Illness & Medical Neglect in an Oregon Prison




PLAINTIFF'S EXHIBIT
**A**

**DRO** | Disability Rights Oregon

Summer 2019

# Introduction

In January of 2018, a 54-year old Oregon State Prison inmate with a long history of mental illness and obvious dementia caught the flu. Over the next month, Michael Barton[1] became sicker and sicker. By mid-January, multiple witnesses report that he was unable to walk or sit up. He eventually stopped eating and trays of uneaten food piled up on the floor. He could not get to the sink in his cell and believed that the water there was poisoning him.[2] The nurses who responded to his cell stood in the doorway and argued with him because they interpreted his irrational resistance to drinking the water in his cell as malingering or an obstinate refusal to follow medical advice. Despite multiple visits and tearful requests to be admitted to the medical infirmary where the physicians at the practice were supposed to care for inmates, he was continually returned to his cell. By early February, he became bedridden and unresponsive to anyone who tried to rouse him.

> [W]e have consistently found that many of the people who suffer most profoundly have mental health needs, cognitive disabilities, or other substantial healthcare needs.

On February 5, 2018, Mr. Barton lost consciousness while being wheeled to the infirmary. He was rushed to a Salem hospital. He arrived at the hospital without having regained consciousness. Four liters of infected pus and fluid were removed from his chest cavity to treat an infection causing a collapsed lung. On February 6, 2018, Mr. Barton died from organ failure resulting from a massive methicillin-resistant staphylococcus aureus (MRSA) infection.[3] Despite the availability and low cost of providing potentially life-saving treatment, Michael Barton did not receive that treatment.

He died because his mental illness and dementia led nursing and medical staff to ignore his true condition and dismiss his ever more desperate complaints and symptoms as manipulative malingering. After being contacted by multiple witnesses who were haunted by the circumstances that led to Mr. Barton's death, Disability Rights Oregon (DRO) conducted an investigation, reviewed his records, and interviewed additional witnesses. Below are the findings of our investigation.

---

1 Mr. Barton's family has authorized DRO to reveal his identity in this report. However, the individual witnesses who have provided information included in the report are referred to in a manner that is designed to conceal their identities as much as possible. Because the inmates referred to in this report are housed in an all-male institution, all witnesses will be referred to with male pronouns regardless of gender.

2 Between January 28 and February 5, he was seen by jail medical staff at least eight times and consistently begged to be admitted to the infirmary. Four of those medical contacts took place at his cell, but the nurses who responded failed to take his vitals or enter his cell.

3 MRSA is a common disease in hospitals, prisons, or other confined care facilities that is treatable with antibiotics.

For the past decade, Disability Rights Oregon has worked to improve the well-being of people with mental health conditions and disabilities who are ensnarled in the criminal justice system. We have visited jails and prisons across the state to monitor conditions and interview people with disabilities who are incarcerated in conditions that often destroy their mental and physical health. When possible, we have worked collaboratively with state agencies and county jails to improve conditions. Throughout our work, we have consistently found that many of the people who suffer most profoundly have mental health needs, cognitive disabilities, or other substantial healthcare needs.

This report continues that work. It reveals a cascade of systemic failures that led to the death of Mr. Barton, an individual who might still be alive but for well-known disabilities that impaired his ability to navigate the medical system that was responsible for his care at the Oregon State Penitentiary.

Disability Rights Oregon's investigation into Mr. Barton's death is supported by multiple eyewitness accounts and ODOC records.

# Eyewitness Accounts

Approximately nine months after Mr. Barton's death, two individuals contacted DRO. Both were eyewitnesses to many of the events that preceded his death. One of those individuals is an Oregon Department of Corrections (ODOC) employee who was reluctant to complain about the system that employed him. He nevertheless contacted DRO because the death of Mr. Barton had haunted him until he could no longer remain silent about what he knew and had seen. He requested that we protect his identity as much as possible because he feared some sort of retaliation by colleagues stating that "you can't imagine what it's like to be blackballed here."

The other was an inmate helper[4] who made a similar request noting that ODOC had retaliated against all inmate helpers by barring them from Oregon State Penitentiary (OSP)'s Behavioral Health Unit and Mental Health Infirmary following another inmate helper's report about conditions to the Statesman Journal.[5]

Following our receipt of the above-noted initial reports, DRO requested and reviewed relevant ODOC records pursuant to our authority under Protection and Advocacy for Individuals with Mental Illness Act of 1986 ("PAIMI Act").[6] Subsequently, DRO received information from three additional witnesses to circumstances and events related to Mr.

---

4  Inmates in Mr. Barton's unit are assisted by 4-8 inmate helpers. Some are "ADL workers" who assist with Adult Daily Living tasks such as toileting. The others are Inmate Peer Companions who have less specific support duties such as being someone to sit next to in a social activity.

5  He reports that this ban was eventually lifted for the MHI, but that inmate helpers were still barred from the BHU at the time of his contacts with DRO.

6  Protection and Advocacy for Individuals with Mental Illness Act of 1986 (the "PAIMI Act") provides for the protection of rights of individuals with mental illness, 42 U.S.C. § 10801 et seq. 42 CFR § 51.41 provides DRO access to ODOC records related to the circumstances that led to Mr. Barton's death.

Barton's condition and death. Those witnesses corroborated and/or expanded upon what we had learned previously.

Our review of the events leading to Mr. Barton's death is thus based on records provided by ODOC and the accounts of at least five witnesses. Importantly, there is little or no daylight between the accounts that we were able to piece together from the five witnesses. In addition, although the witness accounts provided important information that was not available to ODOC, those accounts were not contradicted by the records that ODOC provided to DRO.

## Fears of Retaliation

Based on the concerns of the individuals who eventually provided information to DRO, we consider their willingness to speak with us heroic and will describe the information that they provided in a manner that will conceal their identities as much as possible. Our decision to mask the identities of these and other individuals who contributed to DRO's investigation does not reflect the accuracy of their fears about retaliation. Similarly, it does not reflect the extent to which those fears are attributable to actions by ODOC vs. actions by co-workers who might see complaints or questions about what may have occurred in the secretive world of prison as a violation of an unwritten code that punishes "snitches." More simply, we do not take a position on whether or not ODOC retaliates against complaining inmates and employees as an institution, but we know that people who live and work in Oregon prisons fear many informal types of retaliation by other ODOC employees.

# DRO's Investigation of Michael Barton's Death

Michael Barton was sent to prison for a bank robbery in April of 2017. He arrived with a long history of serious mental illness. The videotaped robbery puzzled his lawyer and the police. He was arrested behind the bank building after he calmly walked away from the lobby carrying a bottle of Gatorade and a bright red bank bag of money. Although he held up a kitchen knife on his way out of the building, that was the first time that anyone saw it, apparently because he forgot to brandish it during the earlier phase of the robbery. The responding police officer wrote that he saw a man "walking south from the bank matching the suspect's description. I locked eyes with the male and he walked towards me. 'It was me.'"

> On one occasion, Mr. Barton pounded the sink in his cell out of frustration that he could not figure out how to turn off the running water faucet.

According to somewhat unclear records, it appears that Mr. Barton was transferred to a special unit at Oregon State Penitentiary (OSP) about five months after he began his sentence because he just couldn't handle the daily demands of mainline prison life. Over the next 17 months, his confusion led Oregon Department of Corrections (ODOC) and its Behavioral Health Services (BHS) department to provide him assistance from inmate helpers and mental health clinicians who repeatedly noted the seriousness of his mental health condition. It was even noted that he could not understand how to open the unlocked door of his cell. On one occasion, Mr. Barton pounded the sink in his cell out of frustration that he could not figure out how to turn off the running water faucet.

## A Viral Illness

In January 2018, Mr. Barton started presenting symptoms of a viral illness consistent with the flu. During the remainder of the month, he was taken to the infirmary in a wheelchair pushed by inmate helpers on multiple occasions. He was seen by a number of nurses and medical providers who ignored his increasingly panicked requests to be admitted to the infirmary. On these occasions, he cried and begged to stay in the infirmary saying that he could not drink the water in his cell to take medications[7] because it made him dizzy. These pleas and the potential significance of Mr. Barton's illogical belief about the water in his cell were ignored or overridden by other concerns. One of those concerns was a fear of treating Mr. Barton in the small OSP infirmary where other patients might catch whatever he had.

---

7  On January 31, 2018, Doxycycline, an antibiotic was prescribed. Prior to that, Mr. Barton's condition was treated with acetaminophen and ibuprofen.

This was voiced by one of the providers who refused to admit Mr. Barton to the infirmary when stating, "I don't want him in my infirmary where he can make other people sick."

> On these occasions, he cried and begged to stay in the infirmary saying that he could not drink the water in his cell to take medications because it made him dizzy.

The medical staff at OSP repeatedly misinterpreted Mr. Barton's obvious inability to understand or follow their instructions (e.g. drink fluids and leave your bunk slowly) as malingering and/or refusal to take medication. Multiple witnesses reported to DRO that as his condition deteriorated, Mr. Barton became too weak to leave his bunk to get water from the sink a few feet away. Meanwhile, Correctional Officers (COs) continued to do their rounds and nurses checked in on Mr. Barton without entering his cell to physically assess him or take vitals. From their vantage point at the doorway, they did not recognize his semi-comatose state or see his swollen and discolored limbs underneath a blanket that was wrapped tightly around his emaciated body.

> [A]n inmate helper asked the Corrections Officers on duty to open Mr. Barton's cell so that he (the helper) could give Mr. Barton some water. The request was refused by a Corrections Officer who answered that, "if he is able to go to the bathroom, he can get his own water."

During the same roughly two-week period, Mr. Barton was seen every day by inmate helpers and other witnesses who observed that his limbs were visibly swollen and that his skin was becoming increasingly dusky gray. On one occasion, an inmate helper asked the COs on duty to open Mr. Barton's cell so that he (the helper) could give Mr. Barton some water. The request was refused by a CO who answered that, "if he is able to go to the bathroom, he can get his own water."

On February 4, 2018, multiple witnesses saw meal trays lying untouched on the floor of Mr. Barton's cell and realized that he had not left his bunk for days. One of those witnesses insisted that a nurse come to evaluate Mr. Barton's obviously serious condition. The nurse who eventually responded refused to enter the cell or take vitals. The same witness eventually entered the cell and lifted Mr. Barton's head to give him a sip of water so that he could swallow what witnesses assume was an antibiotic pill that the nurse passed in from outside of the cell. The witness was so alarmed that he made a series of requests to Security and Medical hoping to convince someone that Mr. Barton needed urgent medical attention.

> One of those witnesses insisted that a nurse come to evaluate
> Mr. Barton's obviously serious condition. The nurse who
> eventually responded refused to enter the cell or take vitals.

The repeated response was that a nurse had seen Mr. Barton and that his condition could wait until an appointment at the OSP infirmary on the following morning. However, records and witness accounts make it clear that the nurse's assessment of Mr. Barton's condition did not include a physical examination. Many hours later, the same individual ended his efforts without being able to convince anyone that Mr. Barton was in a condition that could not wait until morning.

## Weeks after Becoming Ill, Mr. Barton Loses Consciousness

On the next morning (February 5, 2018), Mr. Barton's inmate helper came to pick him up with a wheelchair for his scheduled trip to the infirmary. When Mr. Barton failed to respond from his bed, the inmate helper pushed aside the uneaten meal trays on the floor and went to Mr. Barton's bunk. He saw that Mr. Barton's limbs were even more swollen than before and that his skin was a frighteningly lifeless shade of gray. Because Mr. Barton could not sit up, the inmate helper had to lift him as deadweight into the chair. By the time they were a few feet out of the cell and on their way to the infirmary, Mr. Barton's head flopped to one side. He lost consciousness and his bladder emptied down his leg. The inmate helper screamed for help. Security staff responded with a "Man Down" code.

> The inmate helper had to lift him as deadweight into the chair.
> By the time they were a few feet out of the cell and on their
> way to the infirmary, Mr. Barton's head flopped to one side. He lost
> consciousness and his bladder emptied down his leg.

Mr. Barton never regained consciousness. Once hospitalized in Salem, he was diagnosed with a significant infection. Four liters of MRSA-infected fluid were surgically removed from his chest cavity. Following the surgery, he went into multi-system organ failure. Treatment was ultimately ended. Mr. Barton was pronounced dead at 7:31 p.m. on February 6, 2018.

Mr. Barton's family learned of his death through a Facebook posting authored by a friend of Mr. Barton's which stated "Michael Barton RIP." When a family member contacted the author of the posting, he was told that the friend believed that Mr. Barton had died of heart attack while in custody. Mr. Barton's family did not become aware of the circumstances surrounding his death until DRO succeeded in contacting them in June of 2019.

# A Detailed Portrait of Neglect

DRO's investigation of the circumstances that led to Mr. Barton's death led us to conclude that he died because of negligence.[8] One medical provider after another failed to consider the impact of his mental illness and obvious dementia when called to assess his medical condition and complaints. A review of ODOC records further suggests that these failures and their increasingly negative effects on the medical and mental healthcare that was provided to Mr. Barton began many months before he died.

One witness who contacted DRO observed Mr. Barton shortly before his death on two occasions about a week apart. Another saw Mr. Barton almost daily for the entire seventeen months during which Mr. Barton lived in OSP's Intermediate Care Housing unit. Both witnesses therefore saw Mr. Barton during the period that began approximately one or two weeks before his death when he (Barton) became too ill to leave his cell under his own power.

The consistent accounts of these two individuals and the others who contacted us later described an alarming decline in Mr. Barton's health. His worsening symptoms were met with indifference and/or hostility by nurses who dismissed his increasingly urgent and incoherent complaints. Where others saw a medical crisis, the nurses who refused to enter Mr. Barton's cell and failed to perform a physical examination or measure vital signs saw a chronic and troublesome complainer whose condition was not their problem.

## Too Ill to Get out of Bed

A nurse responded to Mr. Barton's cell about a week before his death, probably on January 31 or February 1. According to multiple witness accounts, this happened only after one of the witnesses made repeated requests for medical attention after observing that Mr. Barton seemed very ill, was unable to get out of his bunk, and was coughing up sputum. The same individual further reported that the nurse who eventually responded refused to enter Mr. Barton's cell in order to take vitals or administer medications that he (the witness) believed to be antibiotics.[9] When spoken to about the apparent seriousness of Mr. Barton's condition and need for a setting where he could get water without needing to get out of bed, the nurse responded that if he (Mr. Barton) couldn't be bothered to get himself water or meds, "that would be too bad for him and that he was a known faker and complainer."

Subsequently and while the nurse watched, one of the reporting individuals entered the cell to hold up Mr. Barton's head so that he could drink a sip of water and swallow the medication. He did not see Mr. Barton again until February 4, 2018, one day before he died.

---

8  DRO has reason to believe that Mr. Barton's death may actually be the result of deliberate indifference, but declines to focus on that distinction at the current time.

9  Multiple witnesses reported to DRO that it was common for nurses to refuse to enter cells in the ICH and elsewhere at OSP.

At least two witnesses reported to DRO that they observed multiple trays of uneaten food on the floor of Mr. Barton's cell during the evening of February 4, 2018. They saw this as an obvious indication that he had not left his bunk for more than a day. They additionally recall that at one of them insisted that "this man has to see a doctor" when he was finally able to summon a nurse to Mr. Barton's cell.

## Nurses Ignore Critical Signs of Medical Emergency

Both of these witnesses additionally recalled a second occasion in which one of them eventually helped Mr. Barton raise his head and take a sip of water to swallow his medication because a nurse again refused to enter the cell. The responding nurse again took no vitals and did not perform even the most rudimentary physical examination. Nevertheless, the nurse assessed that Mr. Barton's condition could wait until an infirmary appointment scheduled for the following morning. Both witnesses report that the nurse remarked that, "he will be okay. Just make sure he has liquids." When one or both of them insisted that Mr. Barton needed urgent medical attention, the nurse responded that "He has an appointment tomorrow morning, and he will be fine till then." Subsequent calls to medical providers about the necessity of getting Mr. Barton to the infirmary immediately were unsuccessful.

## A Physician Is Reluctant to Request a Dementia Assessment

One of the witnesses who contacted DRO is an ODOC employee who reported that he knew Mr. Barton well and routinely checked in on him during daily walks through the ICH.

He shared a widely held opinion that Mr. Barton had some form of dementia, likely the result of alcohol-induced brain damage. He believed that a prescribing physician whose caseload included Mr. Barton held the same opinion, but had not ordered a neurological evaluation to confirm the diagnosis. He (the reporting witness) and his colleagues believed that the same physician was reluctant to take that step because of historical resistance to ordering what were perceived to be "extra" tests and tasks by nurses and other medical providers who resented being asked to do things such as put in or implement orders that were not in the electronic medical record. Similarly, he believed that nurses and other medical staff also resented what they saw as a mental health prescriber "leaving his lane" and interfering with matters that were not his job.

His opinion was based on first-hand and consistent observation. He explained that Mr. Barton was usually friendly and outgoing during their almost daily encounters. During these encounters, he typically tried to help Mr. Barton understand the unit schedule and address other related problems. These included a persistent difficulty with understanding when the cell door was supposed to be locked how to open it when it was unlocked. For that reason, he often checked in with Mr. Barton at 6 p.m., a time when Mr. Barton was

permitted to venture out of his cell because the tier was open. However, Mr. Barton was consistently unable to leave his cell without help to open the door following a reminder that it was unlocked.

## Too Weak to Drink from a Glass, Too Weak to Stand

The same individual reported to DRO that at some point during the weeks before his death, Mr. Barton became too weak to drink out of a glass because he could not lift up his head without help.[10] During the week leading to up to the 2018 Super Bowl, this individual reports that Mr. Barton was in his cell or in the infirmary on every occasion when he (the witness) was in the unit. He reports that Mr. Barton seemed very ill and unable to take care of even his most basic needs.

According to the same individual, there were many other indications of the seriousness of Mr. Barton's situation. One was that he was sleeping during the day, a departure from his normal pattern. He did not come out for open ward and responded to staff only after they attempted to rouse him several times. Also, even though the unit was typically warm, he reports that Mr. Barton was constantly shivering and under his blanket.[11] When Mr. Barton was asked if he had eaten (something that was reportedly not being tracked by staff), he mumbled incomprehensibly. With one exception that occurred shortly before Mr. Barton died, the same individual reports that he did not see Mr. Barton out of his bed during the week before his death.

That exception occurred on either February 3 or 4 when he saw Mr. Barton's return to the Intermediate Care Housing unit (ICH) from a trip to the infirmary. Mr. Barton was very thin. His skin was pale and gray and he appeared to be very weak. The witness watched as Mr. Barton was transferred from an infirmary wheel chair to another wheelchair that stayed in the unit because both chairs were too wide to pass through the doorway. Mr. Barton was moaning and tearful as he labored to get out of the first chair so that he could be transferred across the threshold to the second and reenter the unit. Mr. Barton had a hard time getting up and maintaining a standing position. He managed to do so only by holding onto the bars at the entrance to the unit and was crying. He repeated over and over that "I can't walk. I need help. I can't stand." Mr. Barton's legs shook under the strain of standing long enough to switch wheelchairs.

---

10  Although he might have been able to drink if provided with a straw or water bottle that did not require tipping, straws were not allowed in cells and the appropriate sort of water bottles were only available to inmates who, unlike Mr. Barton, had money to pay for them through OSP's commissary program.
11  Constant shivering and chills are signs of a bacterial infection.

# An ODOC Employee's Request to Have Mr. Barton Readmitted to Infirmary is Denied

This individual was so disturbed by the above scene and his belief that Mr. Barton should not have been discharged from the infirmary that he called to request that Mr. Barton be immediately readmitted. He was told by the responding nurse that he "just needs to rest." Similarly, he reports that much of the correctional and nursing staff assumed that Mr. Barton was just complaining and being melodramatic. Even so, one of the COs who was there at the same time reportedly complained that a CO should not be expected to help an inmate walk because it was clear that anyone who needed that level of help belonged in the infirmary.[12]

12  COs are generally wary of laying hands on inmates without specific instructions or orders to do so.

# ODOC'S Response to Mr. Barton's Death

The above-noted witness returned to work a few days later and learned of Mr. Barton's death from a supervisor in what he described as a "hush hush way." He reports that on previous occasions, he and other staff were informed of inmate deaths by email. In this case, that did not happen. Staff learned of Mr. Barton's death only by informal means.

During the week or two that followed Mr. Barton's death, the same individual heard a number of nurses exchange rumors about its cause. These included a suspected impact of liver disease and the related belief that Mr. Barton's condition should have been treated by the infirmary staff as "more acute" because he was immunologically compromised because of his liver disease. Some nurses believed, but did not seem to know, that MRSA was a lethal factor that may have been a predictable result for an individual with a depleted immune response. Some nurses believed that Mr. Barton should have been kept in the infirmary and others thought he should not have been there because he was too much of a risk to other patients. After the above-noted flurry of rumors and theories about the cause of death, the nurses who worked at the unit avoided mentioning Mr. Barton.

---

He reports that on previous occasions, he and other staff were informed of inmate deaths by email. In this case, that did not happen and staff learned of Mr. Barton's death only by informal means.

---

## The Symptoms of a Complainer

The above account suggests that the nurses had little or no real knowledge about Mr. Barton's condition or medical history. Perhaps that explains why none of them questioned why he was not hospitalized sooner or discussed how their own conduct and attitudes might have been factors in his death.

On the other hand, Mr. Barton's death deeply disturbed many of the other people who worked in his unit. Based on his recollection of informal conversations that followed Mr. Barton's death, one of the witnesses who contacted DRO believes that the entire BHS team shares his own belief that Mr. Barton needed to be in the infirmary and that his death was probably avoidable. He also recalled seeing a CO break into quiet tears upon learning of Mr. Barton's death.

# ODOC's Investigation Paints an Incomplete Picture

ODOC's review of the circumstances that led to Mr. Barton's death was supported by a thorough review of records. It confirmed significant shortcomings of the care that was provided to Mr. Barton, but did not conclude that his death was the result of negligence or neglect. As previously noted, however, ODOC's review was completed without the valuable accounts of the witnesses who provided additional information to DRO. For that reason, we believe that ODOC has not fully identified the changes in policy and practice that will be necessary to avoid similar tragedies in the future.

> Mr. Barton died because of negligence that occurred when one medical provider after another failed to consider the impact of his mental illness and obvious dementia when determining treatment for his condition and symptoms.

Following the medical examiner's decision not to do an autopsy, the ODOC's Chief Medical Officer concluded that the clinical cause of Mr. Barton's death was:

> "Influenza B, leading to secondary MRSA pneumonia (nasal Carrier), leading to MRSA empyema, leading to sepsis, leading to severe septic shock, leading to cardiopulmonary arrests, leading to anorexic brain and multisystem injury, leading to multisystem failure with severe anoxic brain injury. Altogether leading to death."

In other words, Mr. Barton died of a MRSA infection and subsequent complications that occurred after he caught the flu.

However, DRO's investigation of the circumstances that led to his death lead us to conclude that Mr. Barton died because of negligence that occurred when one medical provider after another failed to consider the impact of his mental illness and obvious dementia when determining treatment for his condition and symptoms. Although many of these failures took place during the last days of Mr. Barton's life, it is important to understand and consider who Mr. Barton was when assessing the quality of his medical care and its relationship to his disabilities.

## Placed in Housing for People with Mental Illness & Intellectual Disabilities

As a starting point, it is significant that he lived in OSP's Intermediate Care Housing unit. The ICH is a specialized housing unit designed for individuals who are unable to successfully navigate daily prison life because of mental illness and developmental disabilities. Records do not clarify the reason for Mr. Barton's placement in the ICH, but it

is critical to understand that ODOC knew that he was an individual with a history of mental illness who had exhibited significant signs of dementia when he was moved there from another ODOC prison in September of 2017.

## A History of Mental Illness

ODOC records also confirm that Mr. Barton entered the Oregon Correctional Intake Center on April 27, 2017 with a history of Serious Mental Illness following his conviction for Eluding Police.[13] At the time of his death and during at least the 17 months that preceded it, he also exhibited significant signs of dementia.

Those signs were continually reported in fifteen Behavioral Health Services (BHS) Progress notes that began on September 13, 2017 and ended on January 17, 2018. These notes were created by Qualified Mental Health Professionals (QMHPs.) QMHPs implement mental health treatment plans and otherwise support inmates with mental illness and other conditions that significantly impact cognitive levels and the ability of those inmates to navigate the demands of life in prison.

Mr. Barton's first (September 13, 2017) BHS progress note explains, "Although Mr. Barton has a mood disorder diagnosis, he appeared to be having symptoms of forgetfulness and confusion most associated with Dementia or Alzheimer's." It concludes with a description of Mr. Barton's progress in a treatment plan that is based on his acceptance of packaged units of Dialectical Behavioral Therapy (DBT.) The questionable effectiveness of DBT for an individual who may be suffering from Dementia is not discussed.

## Obvious Signs of Dementia: Difficulty Opening Unlocked Cell Door & Other Simple Tasks

Eight of the fifteen BHS Progress Notes sent to DRO specifically support witness accounts that describe Mr. Barton's inability to open the door of his cell when it is unlocked. A November 14, 2017 BHS Progress Note also documents that peer companions reported that "One time during the day he could not get the water in his sink to turn off and he got so frustrated he began crying and hitting the sink."

The final January 17, 2018 BHS progress note is typical of those that preceded it. It notes that Mr. Barton "continues to be confused about how to open his cell door. He becomes easily frustrated over simple tasks" before assessing that "Mr. Barton has remained the same and progress is slow. His symptoms resemble Dementia and learning to open his cell door and other simple daily tasks are a struggle for him." It concludes by naming the latest DBT packet that Mr. Barton has "accepted" without noting whether or not he read or otherwise learned anything useful from it.

"One time during the day he could not get the water in his sink to turn off and he got so frustrated he began crying and hitting the sink."

---

13  A charge that he pled to after his curious 2016 effort to rob a bank

## Bank Robbery Hatched to Pay for Psychotropic Medication

Accounts of Mr. Barton's robbery also suggest that he may well have been suffering from symptoms of mental illness and/or dementia when he walked into the bank in 2016. The newspaper account of the robbery noted that Mr. Barton he was captured without incident while walking away from the bank.[14]

When DRO contacted his defense attorney about Mr. Barton, she remembered Mr. Barton and his case well. According to this attorney, the robbery occurred while Mr. Barton may have been homeless, but was socializing with men who lived in a group home for individuals with mental illness. Mr. Barton told her that he decided to rob a bank because he had run out of psychotropic medications and had no money to pay for more. In his account to her, it apparently never occurred to him that this might not be a good plan or the best way to access medication. She described the videotaped robbery as an event that suggested a highly impaired sense of practical reality in which Mr. Barton walked into the bank and waited politely and without concern while bank employees were collecting money and contacting the police. She further described how he walked out of the bank with little apparent understanding that he would be pursued while holding a red bank bag full of money.

---

[14] https://mailtribune.com/news/crime-courts-emergencies/medford-police-nab-bank-robbery-suspect-within-minutes

# ODOC Investigation

Although ODOC's investigation of Mr. Barton's death was not informed by the eyewitness accounts that were provided to DRO, it clearly reveals that the prison failed to provide him adequate medical care. It also acknowledges a nursing culture in which some nurses have become indifferent to the needs and symptoms of patients with psychiatric and developmental disabilities.

Despite Mr. Barton's history of serious mental illness, ODOC Medical Manager Dave Brown's February 19, 2019 Death Report indicates that Mr. Barton was not initially placed in special housing or identified as an individual who needed significant mental health services when he became an ODOC prisoner. However, the same report indicates, "Mr. Barton transferred from DRCI [Deer Ridge Correctional Institute] to OSP, where he was housed in the Intermediate Care Housing (ICH) for continuity of his mental healthcare needs. It is unclear the extent of the mental health change that prompted this move other than some increased confusion noted on the intake BHS chart note at OSP on 09/03/16."

A number of ODOC records indicate that the above-noted "increased confusion" should have been profoundly concerning. As noted earlier, following his transfer to ICH and for many months prior to his death, Mr. Barton was repeatedly described as frustrated and angry about being unable to leave his cell when it was unlocked because he could not fathom how to operate the door mechanism. A further indication of dementia or another serious impairment of his ability to understand or accomplish everyday tasks was ODOC's decision to assign him inmate helpers who helped Mr. Barton get to appointments and respond to the mundane demands of life in prison.

## Mr. Barton Repeatedly Asks to Remain in the Infirmary

Brown's report makes no mention of this history or repeated requests by ODOC employees and inmates for medical attention during the last days of December 2017.[15] The report does indicate that Mr. Barton was seen cell-side at 4:30 a.m. on January 31, 2018 before "he was brought to the clinic for further assessment" and his vitals were again taken. His pulse oximeter[16] (pulse ox) reading of 93%[17] continued to register under the lower normal threshold of 95%, but he was observed to be "communicating without difficulty and had no coughing or sputum while in the clinic." Brown also reports that Mr. Barton "repeatedly requested to stay in the infirmary" and that "he was able to eat and drink without concern." It does not document whether he had any ability to leave his bed to eat or drink. Brown notes that Mr. Barton was returned to his cell and that his "chart did not indicate why INF admit was not recommended."

---

15  DRO has no understanding of whether this information was known by the report's author.

16  Pulse Oximeter readings measure the level of oxygen in a person's bloodstream.

17  Pulse oximeter readings below 95% typically activate an alarm, but the available records do not indicate whether this occurred or, if it did occur, that the alarm was turned off.

# The Last Two Weeks of Mr. Barton's Life

Brown reports that Mr. Barton was again "seen in the clinic by a provider at 15:30" on the same day, approximately eleven hours later. In Brown's report, there is no indication of whether Mr. Barton was able to walk to the clinic unaided, required the assistance of his assigned inmate helper, or arrived in a wheel chair pushed by the helper. (However, multiple witnesses who contacted DRO confirmed that Mr. Barton was unable to leave his cell on foot for approximately the last two weeks of his life.) His pulse ox was measured at the somewhat concerning level of 95% and his heart rate had risen to 110.[18][19]

According to Brown's report, Mr. Barton's blood pressure (107/65) was noted to be "only 20 points below baseline" and his appearance was described as "not toxic." A medical provider diagnosed lobar pneumonia and prescribed Doxycycline (an antibiotic) for 10 days. Brown further notes that Mr. Barton reported that he could not drink or eat in his cell because drinking the water there made him dizzy. He then begged to remain in the infirmary where he could eat and drink without leaving bed or drinking water that (he believed) made him dizzy. The provider attempted to explain that the dizziness was a result of sitting up too quickly rather than drinking the water in his cell, but Mr. Barton's request was denied and he was instead advised to sit up slowly to avoid dizziness when he returned to his cell.

## February 3

The next entry in Brown's report is dated February 3, 2018 at 9:45 a.m. It describes Mr. Barton's next contact with a nurse. In that contact, there is again no mention of the fact that Mr. Barton arrived at the infirmary in a wheelchair with the aid of his helper. Mr. Barton complained of continued dizziness and "not feeling well." He also told the nurse that he had not "revived [sic] his meds in a day." According to the report, the nurse consulted Mr. Barton's medical record and disputed the accuracy of his account, apparently without probing whether Mr. Barton had no access to the medication, had been unable to take it, or was disoriented to the extent that he could not remember taking the medication. His pulse ox was up to 97%, but his heart rate continued to be above normal at 104.

A second entry on February 3, 2018 at 8:30 p.m. describes the first of a series of a cell-side encounters that followed Mr. Barton's visit to the infirmary earlier that day. In each of these encounters, it is clear that nurses who bring medication or otherwise respond to Mr. Barton's cell refuse to enter the cell, touch him, take vitals, or perform any sort of physical examination or assessment that could not be completed from the doorway.

During the 8:30 encounter, Mr. Barton "refused to sit or stand for his evening medication" for fifteen minutes of a nurse's requests for him to comply during which "he responded with a raised voice." The same note goes on to say that Mr. Barton continued to refuse

---

18  100 beats per minute is generally considered to be the upper limit of normal.
19  Normal pulse oximeter readings usually range from 95 to 100 percent. Values under 90 percent are considered low. Values under 60 mm Hg usually indicate the need for supplemental oxygen.

requests to sit or stand up when the nurse returned and that therefore, "medication was not administered." The record includes no account of what Mr. Barton may have been saying in a raised voice or if he gave a reason for refusing to sit or stand for his medication. The patient was not physically examined or assessed. No vitals were taken.

## February 4

On February 4, 2018 at 7:00 a.m, Mr. Barton is described as having "refused to sit up for his meds without officer's assistance." It goes on to say that "Officer was able to assist and MR.[sic] Barton took his meds. Nurse educated Mr. Barton on proper hydration, Mr. Barton said he was unable."

There is no mention of uneaten meal trays on the floor of Mr. Barton's cell in this or any of the medical and nursing notes of February 3 or February 4, 2018.

A similar encounter took place at 7:00 am on the next day, February 4, 2018. In that encounter, Mr. Barton is again described as having "refused to sit up for meds without assistance." Although the nurse noted that "he was alert and oriented X3 with clear speech," the nurse did not indicate what Mr. Barton might have been saying. Medication was not administered and was to be "held until an ADL worker[20] is available to assist with sitting Mr. Barton up."[21]

## February 5

The next entry in Brown's report is dated February 5, 2018 at 11:30 a.m., the time when "Staff report to the unit for man down."[22] The entry goes on to say, "staff found MR. (sic) Barton in a wheelchair in distress."

## ODOC's Physician Review

ODOC Physician Reed Paulson's February 7, 2018 Mortality Case Review includes observations and issues that add to the picture already provided by ODOC's separate aforementioned death report and the accounts of the witnesses who contacted DRO.

It documents that Mr. Barton had history of mental illness and was administered

---

20 An "ADL worker" is an Adult Daily Living worker, one of two types of inmate helpers who worked in the ICH.

21 Previously noted witness accounts of the same encounters provides important missing context. According to those accounts, it was apparent that Mr. Barton was unable to get out of bed to access water and unable to take a pill without someone to lift his head while holding a glass of water on multiple occasions. Continued nurse requests for Mr. Barton to stand or sit up were necessary only because of the adamant refusal of nurses to enter Mr. Barton's cell or provide any assistance to him beyond offering medication from a distance. Mr. Barton seemed unable to understand or respond to any efforts to educate him on proper hydration while he was dizzy and too ill to sit up.

22 "Man Down" is a term used in most correctional facilities to announce a medical emergency requiring immediate response by security and medical personnel.

psychotropic medications for Bipolar Disorder by Behavioral Health Services (BHS) during at least some period of his custody in ODOC. Dr. Paulson explains the assignment of an inmate helper to Mr. Barton in July of 2017 as a response to "forgetfulness felt secondary to brain injury from substance abuse."

Dr. Paulson questioned the adequacy of eight (out of fourteen) aspects of Mr. Barton's medical treatment. He did so by rating those eight aspects at level four in a rating system that ranges from one to five where one denotes excellent care and five means that medical care does not meet the Community Standard of care. Within that five-point system, the next lowest rating of four describes care that "may not meet" the Community Standard of medical care.

In simpler terms, he concluded that the care provided in the following eight categories "may not meet" the necessary community standard of care:

- Preventive measures taken,
- Staff response appropriate,
- Level of Housing/care appropriate.
- Diagnosis timely,
- Diagnosis accurate,
- Preventive measures taken,
- Staff response appropriate, and
- Level of housing /care appropriate.

Dr. Paulson's review also reached a number of conclusions that support those of DRO's investigation:

> "Multiple visits with multiple staff and abnormal vital signs after the diagnosis of pneumonia represented opportunities for more and earlier intervention that may have prevented the terminal event. Orthostatic vital signs were never done."

> "Refusal to get up in the final 2 days in cell may have been misinterpreted inability to get up. Patient's mental illness may have been a confusing or distracting factor."

> "Staff safety concerns may have made entering the cell, in the last 3 days, for physical evaluation difficult and RN staff apprehensive."

> "Earlier admit to the infirmary may have made monitoring of condition easier and opportunities for earlier intervention possible. However, the facility is extremely ill-constructed for admitting influenza patients for monitoring, as we have multiple immunocompromised and/or medically fragile patients at all times. This creates an understandable hesitation in staff."

Dr. Paulson concluded his review with recommendations that included measures to facilitate in-cell medical evaluation and the following:

> "Increase RN and Provider staff to appropriate levels to reduce unnecessary mental fatigue and numbing. It is clearly demonstrated in this case that the fault does not lie in one person's mistake, but rather highlights system failure that has affected many staff."

## Additional ODOC Reviews

ODOC provided an additional high-level evaluation of the care that Mr. Barton received in the form of a single hand-written and unsigned page that references the Chief Medical Officer's (CMO) report and therefore suggests that the CMO reports to its author.

---
"[W]e did not recognize that this patient was critically ill"

---

This report notes that "there appear to be a few quality of care issues" before stating that "it seems as though we did not recognize that this patient was critically ill and we struggled with his compliance regarding Doxycycline." The author continues by noting that "his mental illness may have confounded staff's ability to assess his illness, but he had abnormal vital signs that were not acted upon." The author of the report also seems to doubt the accuracy of records that document missed doses of medication: "He only missed one day according to the MARs hmmm."

The same report concludes with the following statement: "Finally, the CMO's report is concerning but it differs in fundamental opinion component to that of the MSM.?? NEED more discussion." We agree and hope that any such discussion leads to meaningful action and reform.

Two ODOC e-mails also raise concerns about the care that Mr. Barton received before his death.

One is a cryptic February 9, 2018 email exchange that seems to endorse the failure of the nursing staff. In a response to some sort of contact or question that was not provided to DRO, an ODOC employee responds, "Ironic you say so considering it's their job to already know this stuff."

The second is a February 12, 2018 e-mail from ODOC Medical Services Manager Carrie Coffey to ODOC Medical Administrator Aimee Hughes.

[ODOC Medical Services Manager] Coffey concludes by saying that "I am going to do a case review with staff to ensure that we learn from this complicated case" based on the below-listed bullet-pointed concerns:

- "29th: why wasn't a quicker appointment made on the 29th Change in BP's from baseline

- Investigation from nurses on intake from ICH Security

- Not being allowed to enter cell to assist patient

- Cognitive status of patient impairing an accurate subjective health status of patient".

# Conclusion

Although DRO shares ODOC's opinion[23] that Mr. Barton's death was attributable to a system failure, we do not agree with the idea that no fault should be attributed to individual actors. Indeed, it is our belief that the conduct of the nurses who responded to Mr. Barton's cell during the last days of his life was surely negligent, if not deliberately indifferent, to the harms that ended his life.

The root causes of that negligent conduct may involve many interrelated and hard-to-quantify factors such as basic competence, poor training, poor supervision, too many administrative demands, staffing ratios, nurse recruitment and retention, and inadequate pay scales. However, the witnesses who contacted us about Mr. Barton universally believed that the nurses who were supposed to care for him were indifferent to his condition. The same reporters described a nurse culture that is rife with resentment about the "extra" difficulties and effort that are demanded when caring for patients whose mental illness and developmental disabilities limit the ability of those patients to understand questions and follow instructions.[24]

DRO shares that assessment and believes that there will be other Michael Bartons unless ODOC changes a culture that allows its nurses to see patients with cognitive and mental health disabilities as less than human.

In simplistic terms, Michael Barton died of a treatable disease that was not recognized and effectively treated by ODOC doctors and nurses. In that sense, because the gravity of his condition was obvious to anyone who bothered to look at him, he died due to negligence on the part of those providers and the system of care within which they worked.

However, because ODOC's nurses and doctors are the only source of healthcare for the thousands of individuals who are behind ODOC bars,[25] it is important to assess their performance in light of a specialized environment that is far different from the one we encounter outside of those bars. Although we may be dissatisfied with many aspects of the healthcare system in our country, if we are not happy with the competence or attitude of a nurse or doctor who is providing us with healthcare, we have at least some ability to go elsewhere or lodge a complaint to get the medical care we need.

That is not the case for prisoners in general. It is even less so the case for the large percentage of ODOC prisoners who, like Michael Barton, have disabilities that limit their ability to understand their environment or effectively communicate with doctors and

---

23  As stated by Dr. Paulson.

24  It is important to consider the impact of this attitude on the individuals who live in a specialized housing where a high percentage of the residents have been unable survive in general population because of mental illness and/or developmental disabilities

25  Outside care is provided to ODOC inmates under some circumstances, but as a rule, that is a rare occurrence.

nurses. That difference is even more true and acutely important in a specialized housing unit like the Intermediate Care Housing unit where Mr. Barton lived because of disabilities that rendered him unable to open an unlocked cell door.

To be sure, providing adequate medical care to an individual like Mr. Barton in a prison environment presents difficulties that require a heightened level of expertise and attention. Our investigation reveals that neither was available to him in the ICH. Instead, it exposes a medical culture, particularly among the nurses who failed to even examine a man whose condition alarmed many people; that should concern all of us.

At best, that culture tolerated a consistent failure to recognize or account for the impact of Mr. Barton's mental illness and dementia on his ability to communicate and understand his situation. Medical providers either did not care or did not understand that he could not competently respond to routine questions and instructions. At worst, it fostered a callous disregard for his welfare by the people who were supposed to care for him. In the insular environment of prison, Mr. Barton's death makes it clear that such a culture can be lethal.

As stated in an earlier portion of this report, DRO is not in a position to evaluate and weigh the relative importance of many factors that may have contributed to the creation of such a culture. We can and do say, however, that such an analysis, along with a subsequent implementation of effective steps to change that culture, is the legal and moral duty of the Oregon Department of Corrections.

# Recommendations

DRO makes the following recommendations to ODOC.

### Hire Independent Prison Health Expert

ODOC should consult with DRO to identify an independent prison health expert with successful experience in systemic reform of healthcare systems in correctional settings and extensive knowledge of the impact of mental illness and/or developmental disabilities on the ability of inmates to access medical care.

### Evaluate Investigations into Mr. Barton's Death

ODOC should contract with the above-described independent prison health to ensure that this expert will review the investigations of Mr. Barton's death that were conducted by DRO and ODOC.

### Identify Root Causes and Implement Necessary Changes

Based on the input and opinion of the independent prison health expert, ODOC should:

> A. Identify the root causes, including but not limited to, the hiring and supervision of ODOC nurses that contributed to Mr. Barton's death;

> B. Assess the impact of the current nursing culture on the medical care that is provided to inmates with mental illness and/or developmental disabilities; and

> C. Identify and implement changes in policies and practices that would reduce or eliminate the above-noted root causes and negative aspects of nursing culture.

### Facilitate the Independent Assessment of the Quality of Healthcare for Inmates with Mental Illness and/or Developmental Disabilities

ODOC should empower the independent prison health expert to review records, staffing levels, policies, and practices that impact the quality and consistency of medical care provided to inmates with mental illness and/or developmental disabilities. ODOC should also empower the expert to speak confidentially with inmates, ODOC administrators, staff,

contractors, and employees to discuss the quality of medical care provided to inmates with mental illness and/or developmental disabilities.

### Facilitate the Independent Investigation of Retaliation on Medical Care for Inmates with Mental Illness and/or Developmental Disabilities

ODOC should empower the independent prison health expert to identify the significance of and basis for fear of retaliation by inmates and staff who complain about ODOC medical care provided to inmates with mental illness and/or developmental disabilities.

### Provide the Independent Expert with any needed Assistance needed to Issue a Report on Medical Care Provided to Inmates with Mental Illness and/or Developmental Disabilities

Within one year, the independent prison health expert should issue a two-fold public report and ODOC should accept that report as a basis for further action. The report should contain both findings about the level of medical care provided to inmates with mental illness and/or developmental disabilities and recommendations supported by measurable objectives within a specified timeframe that will reduce or eliminate ineffective and disparately delivered healthcare for inmates with mental illness and/or developmental disabilities.

### Adopt and implement the Recommendations of the Independent Expert

ODOC administrators and employees should work with the independent prison health expert to implement and troubleshoot the recommendations contained in the report described above for one year following the publication of the report.

### Publicly Release the Independent Expert's Evaluation of ODOC's Success in Improving Medical Care for Inmates with Mental Illness and/or Developmental Disabilities after One Year

At the conclusion of the above-noted year, ODOC should publicly release the independent prison health expert's final report that describes 1) the effectiveness of ODOC's efforts to increase the quality of medical care provided to inmates with mental illness and/or developmental disabilities; and 2) any additional reforms that will be needed to ensure that inmates with mental illness and/or developmental disabilities receive effective medical care while in ODOC custody.

# Acknowledgements

Written by Joel Greenberg, Disability Rights Oregon staff attorney.

The author thanks the family of Michael Barton and the heroic individuals who contacted DRO about the circumstances of Mr. Barton's death.

Booking photo on front cover credit: Medford police

Disability Rights Oregon is tax-exempt under Section 501(c)(3) of the Internal Revenue Code. Contributions are tax-deductible and will help us provide services to Oregonians with disabilities. Portions of this report may be reproduced without permission of Disability Rights Oregon, provided that the source be appropriately credited.

This publication was funded 100% by a grant from the Substance Abuse and Mental Health Services Administration (SAMHSA).

Disability Rights Oregon is the Protection and Advocacy Agency for Oregon.

DRO | Disability Rights Oregon

Disability Rights Oregon
511 SW 10th Ave Suite 200
Portland OR 97205

503-243-2081 or 800-452-1694
FAX 503-243-1738
droregon.org